**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**BRADLEY HENDERSON BROWN,**

     **Plaintiff,**

**v.**                                   **CASE NO. 2:10-cv-01147**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Bradley Henderson Brown (hereinafter referred to as "Claimant"), filed an application for SSI on July 9, 2008, alleging disability as of June 1, 2002, due to ankylosing spondylitis and a learning disability.  (Tr. at 12, 119-21, 158-65, 198-204, 216-220.)  The claim was denied initially and upon reconsideration.  (Tr. at 15, 72-76, 78-80.)  On August 11, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 83.)  The hearing was held on February 18, 2010 before the Honorable Thomas W. Erwin.  (Tr. at 30-69, 93, 99.)  By decision dated March 25, 2010, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 12-29.)  The ALJ's decision became the final decision of the Commissioner on September 14, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5, 227-28.)  On September 28, 2010, Claimant

brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2010).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and

2

mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2010).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 14.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of history of juvenile rheumatoid arthritis, back pain/possible ankylosing spondylosis, pelvic pain, borderline intellectual functioning, and anxiety disorder.  (Tr. at 14-16.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-18.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 18-23.)  Claimant has no past relevant work.  (Tr. at 23.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as cleaner, hand packer, and price marker which exist in significant numbers in the national economy.  (Tr. at 23-24.)  On this basis, benefits were denied.  (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

> preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368

F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged

with resolving conflicts in the evidence.  Hays v.Sullivan, 907 F.2d 1453, 1456 (4th Cir.

1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot

escape their duty to scrutinize the record as a whole to determine whether the conclusions

reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported

by substantial evidence.

Claimant's Background

Claimant was twenty years old at the time of the administrative hearing.  (Tr. at 38.)

He is a high school graduate and attended special education classes for mathematics and

English.  (Tr. at 38, 241.)  He has no employment history or past relevant work.  (Tr. at 39.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of

record, and will summarize it briefly below.

Physical

Records indicate Claimant was born at Charleston Area Medical Center [CAMC] on

July 28, 1989 with a diagnosis of "normal newborn male" and discharged on August 1, 1989.

(Tr. at 407.)  On August 11, 1989, CAMC Pediatric Clinic notes state: "2 wk [week] old WM

[white male] w/ [with] hx [history] of transient sinus bradycardia just p [*sic*] birth,

evaluated…with apparently normal EKG…Mother reports infant is doing well."  (Tr. at

4

408.)  Notes dated August 25, 1989 state: "4 wk old WM for routine checkup.  Doing well."

(Tr. at 418.)  Many of the hospital records are handwritten and illegible.  (Tr. at 387-420.)

Records indicate Claimant was treated by Ghassan Dagher, M.D., an opthalmologist,

from February 28, 1994 to August 24, 2009 for vision checks.  (Tr. at 356-66, 422-28.)

Although the handwritten notes are largely illegible, notes dated December 29, 2006

indicate: "Glasses...Blurred Vision...20/15...20/15." (Tr. at 427.) Notes dated July 31, 2007

and August 24, 2009 indicate: "20/20...20/20."  (Tr. at 356, 428.)

Records indicate Claimant was treated by Michael Istfan, M.D., Rheumatology

Associates PLLC, from December 17, 2001 to September 11, 2009.  (Tr. at 300-55.)

Although the handwritten notes are largely illegible, typed notes dated January 2, 2002

state:

> There was no nodules or mucocutaneous lesions.  Laboratory studies
> included and essentially normal CBC and chemistry profile.  Sedimentation
> rate was normal at 10 mm/hr.  Rheumatoid factors were negative.  HLA B27
> was positive.  Urinalysis was clear.  Radiographs of the hands and feet were
> unremarkable with the exception of soft tissue swelling of the right fifth MTP
> [metatarsophalangeal].
>
> I suspect that Bradley is in the early stages of spondyloarthropathy that
> remains undifferentiated at this time.  He may develop more distinct disease
> pattern such as Reiter's syndrome or classic ankylosing spondylitis in the
> future.  In regards to treatment, I recommend Ibuprofen 200-mg t.i.d [*ter in
> die*, three times a day] and also suggested an ophthalmologic evaluation to
> rule out associated uveitis.  I plan to follow Bradley regularly and will modify
> his regimen as deemed necessary.

(Tr. at 355.)

On February 13, 2004, Kenneth Dwyer, M.D., Radiologist, Montgomery General

Hospital, reported that Claimant had x-rays of his pelvis, both hands and wrists.  (Tr. at

371.)  Dr. Dwyer concluded: "Negative AP view of the pelvis...No diagnostic arthritic

changes are demonstrated in the hands and wrists." Id.

Records indicate Claimant had outpatient laboratory tests at Montgomery General Hospital at various times between February 13, 2004 and December 3, 2009. (Tr. at 367-74, 472-83.)

Additional typed notes from Dr. Istfan dated December 12, 2005 indicate: "Essentially normal hands. Question mild inflammatory arthritis at the PIP joints." (Tr. at 330.) Typed notes dated June 19, 2008 indicate: "Likely sacroiliitis suggestive of spondyloarthropathy." (Tr. at 310.) Typed notes dated April 15, 2009 indicate: "Normal radiographic appearance of the right hip. Suspect sacroiliitis." (Tr. at 304.)

On May 9, 2007, John M. Eckerd, M.D., Associate Professor of Pediatrics, Cardiology Section, West Virginia University, Robert C. Byrd Health Sciences Center, evaluated Claimant and determined:

> The patient's electrocardiogram is within normal limits.
>
> The patient's echocardiogram demonstrated no structural defect with normal bi-ventricular function.
>
> Plan:
> 1.  This young man believes that he is having intermittent rapid heart rate. I explained to him that this symptom is fairly common in teenagers, and does not necessarily represent a cardiac arrhythmia. In any case, I offered event monitoring to Bradley, and he declined. I gave him my card with the phone number in case he changes his mind.
> 2.  I find no evidence of structural heart defect in this young man. Endocarditis prophylaxis is not required for dental and surgical procedures.
> 3.  This patient has no activity restriction from a cardiac standpoint, and can participate in high static/high dynamic activities, according to American College of Cardiology guidelines.
> 4.  I find no evidence of rheumatic or autoimmune cardiac involvement. He should continue in his follow up with Dr. Istfan. He has an appointment to see him soon.

(Tr. at 230.)

On February 20, 2007, May 24, 2007, and July 27, 2007, Claimant was treated at Clay County Primary Health Care Systems. (Tr. at 231-36.) Notes indicate Claimant sought treatment because he was in a car accident on February 19, 2007: "He states he is able to ambulate without difficulty. Pain with turning of neck only. No other complaints at this time...Today's Diagnosis: 1) Neck sprain (whiplash)...Plan: 1. Skelaxin 800mg 1 tab po q 8 hrs prn #30, 2. Motrin 800mg 1 tab po TID prn #30." (Tr. at 231.) On May 24, 2007, notes indicate the visit is a "follow up on acne...here today to discuss additional treatment." (Tr. at 233.) On July 27, 2007, notes indicate the visit is another follow up regarding acne: "states that his acne is just now beginning to get a little better...States that his ear pain is not constant in nature...reassurance that there was a normal exam/findings of the ear." (Tr. at 235.)

Additional notes indicate Claimant was treated at Clay County Primary Health Care systems on August 8, 2008, August 13, 2008, and August 22, 2008 for ingrown toenails and toenail removal. (Tr. at 430-35.)

On September 23, 2008, Claimant had lumbar spine x-ray at Summersville Memorial Hospital. (Tr. at 237, 242.) Halberto G. Cruz, M.D. indicated: "Findings: No obvious fracture, dislocation, or other significant bony abnormalities except for subtle lumbar dextroscoliosis." Id.

On September 29, 2008, a State agency medical source provided a consultative examination report of Claimant. (Tr. at 238-45.) The examiner, Miraflor G. Khorshad, M.D., concluded:

He is attesting disability because of the following:
1. He was diagnosed with a juvenile rheumatoid arthritis since age 12 years old by Dr. Dobbins. Then he was referred to a rheumatologist by Dr. Estefan. His symptoms consisted of swelling of the PIP joints of his hands and toes.

2. He was diagnosed with Ankylosing Spondylitis also a the age of 12 years old. He describes pain on his lumbar spine and bilateral hip. He has been treated with prednisone. He also had a bout of Iritis at one time.

3. As observed, patient is able to read the information from the medical poster inside the exam room. He admits that he knows how to count bills and make change. He is able to bathe and dress himself. He is able to do dishes at home.

Review of medical records showed the following:
1. Progress notes, 11-23-05 through 07-15-08. Rheumatology Associates. Diagnosis: Juvenile Rheumatoid Arthritis. Iritis. Photosensitive. Ankylosing Spondylitis.

DIAGNOSIS:
1. Clinical History, Juvenile Rheumatoid Arthritis.
2. Rule out Lupus Erythematosus.
3. Lumbar Dextroscoliosis (Lumbar X-ray, 09-23-08).

(Tr. at 241.)

On October 8, 2008, a State agency medical source provided a Physical Residual Functional Capacity (RFC) Assessment and opined that Claimant had no exertional, postural, manipulative, visual, communicative or environmental limitations. (Tr. at 246-53.) The examiner, Rogelio Lim, M.D., concluded: "CE [clinical examination] shows a basically normal exam other than a history of juvenile RA [rheumatoid arthritis]. X-ray of back shows some scoliosis but that's it. OBJECTIVE FINDINGS UNREMARKABLE. X-RAY SOME SCOLIOSIS MILD AND NO SIGNIFICANT SIGNIFICANCE. ALLEGATIONS NOT CREDIBLE. SLIGHT OR NON SEVERE." (Tr. at 253.)

On October 31, 2008, Claimant was treated at Clay County Primary Care for a rash on his neck that was diagnosed as dermatitis. (Tr. at 436-37.)

8

On March 4, 2009, Claimant was treated at Clay County Primary Care for followup on a motor vehicle accident wherein Claimant stated that he was "side swiped with a coal truck.  Went to the ER - had x-rays and CT of head.  All very neg.  Has ibu [ibuprofen] and muscle relaxants at home...appears well...no bruising or discoloration noted."  (Tr. at 439.)

On July 2, 2009,  a State agency medical source provided a Physical Residual Functional Capacity (RFC) Assessment form and marked no exertional, postural, manipulative, visual, communicative or environmental limitations.  (Tr. at 276-83.) The examiner, A. Rafael Gomez, M.D., concluded: "Non severe physical impairment."  (Tr. at 283.)

On July 14, 2009 and November 3, 2009, Claimant had appointments with Dr. Istfan, Rheumatology Associates PLLC.  (Tr. at 469-71.) Although the handwritten notes are largely illegible, the words "feels some better overall...modest improvement" are legible. (Tr. at 471.)

Psychiatric

On December 5, 2008, a State agency medical source completed an Adult Mental Profile report.   (Tr. at 255-61, 448-53.)   The evaluator, Larry Legg, M.A., licensed psychologist, found that Claimant had never received any outpatient community mental health services, been hospitalized for any psychiatric or psychological reasons, or ever taken any psychotropic medications.  (Tr. at 257.)  Mr. Legg found that WRAT-3 testing showed Claimant to be reading at a sixth grade level (standard score 85), spelling at a high school level (standard score 106), and having arithmetic skills at a fifth grade level (standard score 75).  (Tr. at 259.)  He concluded:

MENTAL STATUS EXAMINATION: Appearance: Mr. Brown has brown eyes

and brown hair.  He was appropriately and casually dressed and groomed this date.  Attitude/Behavior: Motivated, cooperative, and polite.  Speech: Normal tones, adequate production.  Orientation: Oriented X 4.  Mood: Euthymic.  Affect: Broad.  Thought Process: Stream of thought was within normal limits.  Thought Content: Normal.  Perceptual: No evidence of hallucinations or illusions.  Insight: Fair.  Psychomotor Behavior: Normal.  Judgment: Within normal limits, based on his response to the "mail it" question on the WAIS-III Comprehensive subtest.  Suicidal/Homicidal Ideation: None reported.  Immediate Memory: Judged to be within normal limits, as Mr. Brown could repeat a list of four words given to him back to me immediately.  Recent Memory: Judged to be within normal limits, as Mr. Brown could recall all four of the four words given to him five minutes prior to this request.  Remote Memory: Judged to be within normal limits, based on clinical observations of his ability to recall details of his personal history.  Concentration: Judged to be mildly deficient, based on a WAIS-III Digit Span subtest scaled score of 6.  Persistence: Within normal limits, as demonstrated by clinical observations of his ability to stay on task during today's evaluation.  Pace: Within normal limits, as observed during today's Mental Status Examination.

SOCIAL FUNCTIONING: During the Evaluation: Within normal limits, based on clinical observations of his social interaction with me and others during the evaluation.  Self-Reported: Mr. Brown reports that he has several friends including a girlfriend.  He interacts with his friends via the phone, E-mail, and My Space postings.  He interacts with several family members on a regular basis as well.  He leaves his home three or four times a week to run errands with his mother or attend church.  His most enjoyable activities are attending church services and interacting with his niece and nephew.

DAILY ACTIVITIES: Typical Day: Mr. Brown arises around 8:30 in the morning.  He goes to bed around 10:00 p.m.  He eats three meals a day.  In the morning he will read his Bible and do light housework.  He takes his medications.  In the afternoon he will rest.  He will run errands with his mother from time to time.  Activities List: Mr. Brown reports today that most of his day is spent at home performing light household chores and watching television.

DIAGNOSES:

| Axis I | V71.09 | No diagnosis. |
| Axis II | V62.89 | Borderline intellectual functioning. |
| Axis III | | Ankylosing spondylitis and acne - by claimant report. |

DIAGNOSTIC RATIONALE: The diagnosis of borderline intellectual functioning [BIF] is being made based upon results from our testing this date.

PROGNOSIS: Good.

CAPABILITY: In my opinion, Mr. Brown is currently capable of managing his own finances.

(Tr. at 259-60.)

On December 16, 2008, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 262-75.)  The evaluator, Holly Cloonan, Ph.D., found Claimant's impairment was not severe regarding his Borderline Intellectual Functioning disorder.  (Tr. at 262-63.)  She found Claimant had no limitations regarding activities of daily living and in maintaining social functioning, mild limitation in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. at 272.)  She stated that the evidence does not establish the presence of "C" criteria.  (Tr. at 273.) Dr. Cloonan concluded:

This claimant alleges a learning disability.  The school records show he had trouble with English but psych [psychological] testing does not show any evidence of MR [mental retardation].  IQ's have ranged in the 70's to 90's.

His function report doesn't really show any functional limitations related to MR or a severe learning disability.

In the internist exam Dr. Korshad noted that the claimant didn't have any trouble reading the chart in his office and seemed to not have any sever[e] psych problems.

THE CLAIMANT IS CREDIBLE BASED ON A HIGH DEGREE OF CONSISTENCY BETWEEN HIS ALLEGATION OF LEARNING PROBLEMS & FINDINGS OF BIF REPORTED BY THE CE SOURCE.  DESPITE BIF, THE CLAIMANT FUNCTIONS WELL ACCORDING TO HIS DESCRIPTIONS ON THE FORM & TO THE SOURCE.  HE DOES NOT ALLEGE ANY LIMITS IN MENTAL ABILITIES OR IN SOCIAL FUNCTIONING.  HE HAS NO OTHER MENTAL CONDITION.  NONSEVERE.

(Tr. at 274.)

On July 6, 2009, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 285-99.)  The evaluator, Timothy Saar, Ph.D., found Claimant's impairment was not severe regarding his Borderline Intellectual Functioning disorder.  (Tr. at 285-86.)  He found Claimant had no limitations regarding activities of daily living, in maintaining social functioning,  concentration, persistence or pace, and no episodes of decompensation. (Tr. at 295.)  She stated that the evidence does not establish the presence of "C" criteria.  (Tr. at 296.) Dr. Cloonan concluded: "CLMT PARTIALLY CREDIBLE RE: CON, AS CE DOES NOT SUPPORT CLAIMS.  ALL AREAS WNL [within normal limits] OR MILD.  DECISION - IMPAIRMENT NOT SEVERE."  (Tr. at 297.)

On October 5, 2009, Claimant was treated at Clay County Primary Care due to "complaints of increased anxiety and nervousness.  Patient states he has felt this way for many years and now feels as though he needs assistance with the anxiety.  Mom is with patient and states that the father also has lived with anxiety issues for many years...Discussed Process Strategies and their walk-in clinic with the patient and the mother who are both in agreement to go this week to the walk-in clinic.  No formal referral needed." (Tr. at 443-44.)

On November 12, 2009, Randy Warren, M.D., a psychiatrist, reported a "Complete Evaluation" of Claimant wherein he found:

> **Mental Status**: Bradley is friendly, attentive, fully communicative, casually groomed, underweight, but appears anxious.  He exhibits speech that is normal in rate, volume, and articulation and is coherent and spontaneous. Language skills are intact.  There are signs of anxiety.  Affect is appropriate, full range, and congruent with mood.  There are no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. Associations are intact, thinking is logical, and thought content is

12

appropriate.  The patient convincingly denies suicidal ideas or intentions.
Homicidal ideas or intentions are convincingly denied.  Cognitive functioning
and fund of knowledge is intact and age appropriate.  Short and long term
memory are intact, as is ability to abstract and do arithmetic calculations.
This patient is fully oriented.  Vocabulary and fund of knowledge indicate
cognitive functioning in the normal range.  Insight into illness is normal.
Social judgment is intact.  There are no signs of hyperactive or attention
difficulties.

**Diagnoses**: The following Diagnoses are based on currently available
information and may change as additional information becomes available.

Axis I:
Panic Disorder with Agoraphobia, 300.21
Social Phobia, 300.23
Obsessive Compulsive Disorder [OCD], 300.3
Mathematics Disorder, 315.1
Reading Disorder, 315.00

**Instructions / Recommendations / Plan**:
Start Prozac 20 mg daily.  Recommended psychotherapy but patient resistant
and declined at this time.  Bradley was informed of the risks and benefits of
medication.  He was able to voice understanding of the risks and benefits of
medication prescribed and chose to try medication.

Start Fluoxetine 20 mg 1 Cap Daily #30 (thirty)

(Tr. at 459-62.)

On December 8, 2009, Claimant had a follow-up visit with Dr. Warren for

medication management: "Started on Prozac at first visit.  Has seen much benefit from the

medication.  Continues to experience OCD symptoms and still staying at home.  Sleeping

well.    Appetite    good…Impression/Therapy    Content/Progress:    Minimal

improvement…Increase Prozac to 40 mg.  Increase Fluoxetine 40 mg 1 Cap Daily #30

(thirty)."  (Tr. at 463-64.)

On December 28, 2009, Sheila Emerson Kelly, M.A., Licensed Psychologist,

provided a psychological evaluation of Claimant upon referral by his representative who

was attempting "to identify any cognitive or emotional disabilities which would interfere in Mr. Brown's ability to work."  (Tr. at 484.) Ms. Kelly concluded:

<u>MENTAL STATUS EXAMINATION</u>:

This is a small, slender, immature, rather effeminate, white male accompanied by his mother.  He is immaculately and fashionably dressed and extremely clean.  He moves without apparent difficulty and sat for the most part without pain although towards the end of the interview, he became a bit uncomfortable.

It's very clear that his arthritic pain has the secondary gain of enabling his avoidant, passive-dependent, and socially phobic behavior....He complains of Obsessive-Compulsive Disorder and claims that he can't stand things in the household to be out of place but he does not appear to be germ phobic.

During the testing procedure, it became obvious that he becomes very anxious if he is frustrated and then decompensates as he becomes more embarrassed at his limitations.  His problem solving skills tend to be a little limited, particularly under stress.

On the Mental Status Examination, he obtained a score of 26 out of 30. He could not recall the name of my building, could not spell the word "world" backwards, and had some difficulty following a three-stage command.  He was able to recall three out of three items after five minutes and was able to accurately repeat a brief phrase.  On the Wechsler Adult Intelligence Scale-III, he was able to recall six digits forward and three in reverse.

<u>TEST RESULTS</u>

Subtest scores on the Wechsler Adult Intelligence Scale-III...These subtest scores yield the following IQ scores (a score between 90 and 110 is considered to fall within the average range):

| <u>Area</u> | <u>IQ Score</u> | <u>Percentile</u> |
|---|---|---|
| Verbal IQ | 80 | 9th |
| Performance IQ | 86 | 18th |
| Full Scale IQ | 81 | 10th |
| Verbal Comprehensive Index | 80 | 9th |
| Perceptual Organization Index | 93 | 32nd |

In general, his perceptual motor skills tend to be stronger than his verbally based skills.  His Full Scale IQ falls within the borderline range of

intellectual ability although her [sic] Performance scores fall generally within the low average to average range.  His ability to abstract as measured by the Similarities subtest is particularly limited…

On the Wide Range Achievement Test-4, he obtained the following scores:

| Subtest | Standard Score | Functioning Level |
|---|---|---|
| Word Reading | 85 | 8.0 Grade |
| Math Computation | 76 | 4.9 Grade |

His reading and arithmetic abilities are limited relative to his educational achievement but are consistent with the cognitive scores obtained on the Wechsler Adult Intelligence Scale-III.

Mr. Brown was able to complete the Millon Clinical Multiaxial Inventory-III without complaint or significant difficulty and within an average amount of time.  The profile was valid.  His scores on the scales that evaluate anxiety and somatic concerns were predictably elevated.  He is quite anxious and he is very focused on pain and other somatic concerns.  His Clinical Personality Patterns describe him as an individual who is very schizoid and socially anxious.  His behavior is characterized by emotional distance, inaccessibility, and isolation.  He has few social interests and little interest in sexuality.  He has serious relationship difficulties and will appear rather apathetic, aloof, and introverted.   He is indifferent to social relationships and does not seek out social contacts.  He requires little in the way of affection and will appear rather bland.  He is likely to be asexual perhaps as a result of his relationship deficits.  He is content to be passive, detached, distant, and a loner.  His self-esteem is likely to be rather poor.  His behavior is characterized by and motivated by a fear of rejection.  This leads to physical and emotional withdrawal in public in order to avoid social disapproval.  Independent action may be stymied and emotions suppressed because of insecurity.  He feels inadequate and will therefore avoid actions that will lead to autonomy.

RESIDUAL FUNCTIONAL CAPACITY:

*Activities of Daily Living*:

Mr. Brown has lived with his parents all of his life.  He is diagnosed with ankylosing spondylitis, a rheumatoid arthritis disorder.   More significantly however, he has a social phobia and tends to be extremely avoidant and to some degree agoraphobic.  He is an anxious individual and his rheumatoid pain tends to allow him to avoid the social situations which cause him such distress.

He obtained a driver's license eventually after failing the examination

seven to eight times. He drives locally several times a week.

He has very little in the way of hobbies or recreational interests. He's a somewhat of obsessive cleaner by his own description. He states that he cannot stand to see household items out of order/out of place. He has no regular household responsibilities but does assist his mother with some light housecleaning. He very rarely leaves home and if he does leave home, he does not go into any situations with strangers or numerous individuals.

*Social Functioning*:

Mr. Brown is a very anxious, socially phobic individual who has difficulty dealing with social situations and people. He will decompensate very rapidly in such situations into a very anxious state. He does attend church with his mother but the church is a five to seven member congregation consisting for the most part of family members. Otherwise, he is not involved in any social situations by his report.

*Concentration, Persistence, and Pace*:

Mr. Brown has a history of placement as a special education student with learning disabilities. Today, his intellectual functioning falls within the borderline to low average range of ability and his reading and arithmetic are reasonably consistent with that. He decompensates very rapidly if frustrated/confused, becoming more anxious and therefore more unable to focus and concentrate.

*Deterioration in Work or Work-like Settings*:

Mr. Brown has never been employed. He made it through high school by virtue of forcing himself to attend. In middle school, he consistently called his mother on a daily basis begging her to come and get him and take him home due to his social anxiety.

Mr. Brown is competent to manage his own financial affairs should he be determined to be disabled.

DIAGNOSTIC IMPRESSION:

Axis I       Generalized Anxiety Disorder
               Social Phobia
               Pain Disorder Associated with General Medical
               Condition and Psychological Factors
Axis II     Probable Personality Disorder, Not Otherwise Specified, with
               Dependent, Avoidant, Schizoid, and Obsessive Characteristics.

16

|            | Borderline Intellectual Functioning |
|------------|-------------------------------------|
| Axis III   | Ankylosing Spondylitis              |

(Tr. at 487-91.)

On December 28, 2009, Ms. Kelly also completed a form wherein she check-marked that she found Claimant to be "extremely limited" in the "ability to interact appropriately with the general public"; "markedly limited" in the "ability to maintain regular attendance and be punctual within customary tolerances…to work in coordination or proximity to others without being unduly distracted by them…to complete a normal work day & work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods…to set realistic goals or make plans independently of others."  (Tr. at 495-97.)

Ms. Kelly marked that Claimant was "moderately limited" in the "ability to understand and remember detailed instructions…to carry out detailed instructions…to maintain attention for extended periods…to make simple work-related decisions…to ask simple questions or request assistance…to accept instructions and respond appropriately to criticism from supervisors…to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes…to travel in unfamiliar places or use public transportation."  (Tr. at 495-96.)

She marked that he was "slightly limited" in his "ability to remember work-like procedures…to understand and remember very short and simple instructions…to carry out very short and simple instructions…to sustain an ordinary routine without special supervision…to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness…to respond appropriately to changes in a routine work setting…to

be aware of normal hazards and take appropriate precaution." Id.  Ms. Kelly found that Claimant had no areas in which he was "not limited." (Tr. at 495-97.)

On January 11, 2010, Claimant had a follow-up appointment for medication management with Dr. Warren:

> Reports that he has seen some minimal improvement with the increased Prozac.  Continues to obsess over anything out of place or dirty dishes in the sink.  Has been able to handle things a little better.  Has got out much.  Can't do a great deal because of his arthritis.  Reports that he is pain most of the time...Instructions / Recommendations / Plan: Increase Prozac to 80 mg. Increase Fluoxetine 40 mg 2 Caps PO Daily #60 (sixty) X 2 [refills].

(Tr. at 466-67.)

On February 23, 2010, Dr. Warren completed a "Mental Impairment Questionnaire (RFC & Listings)." (Tr. at 499-504.) Dr. Warren stated that he saw Claimant "on a monthly basis beginning in Nov. '09." (Tr. at 499.) He identified Claimant's "signs and symptoms" as: "Social withdrawal or isolation; Recurrent panic attacks; Obsessions or compulsions; Generalized persistent anxiety." Id. He stated that Claimant's medications are: "Prozac 40 mg...Luvox CR 100mg." (Tr. at 500.) Dr. Warren check marked "Yes" to the question "Has your patient's impairment lasted or can  it be expected to last at least twelve months?" Id. He marked "No" to the question "Does the psychiatric condition exacerbate your patient's experience of pain or any other physical symptom?" Id.  He marked "more than three times a month" to the question "On the average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work?" Id.  Dr. Warren marked that Claimant was "Extremely Limited" in his ability "to maintain regular attendance and be punctual within customary tolerances; to work in coordination or proximity to others without being unduly distracted by them; to complete a normal work

day & work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to travel in unfamiliar places or use public transportation." (Tr. at 502-03.)  He marked that Claimant was "Markedly Limited" in his ability "to interact appropriately with the general public; to respond appropriately to changes in a routine work setting." Id.  He found that Claimant's abilities were not "Moderately Limited" in any of the Mental RFC areas.  Id.  He marked that Claimant was "Slightly Limited" in the ability "to maintain attention for extended periods." (Tr. at 502.)  He found that Claimant was "Not Limited" in his ability "to remember work-like procedures; to understand and remember very short and simple instructions; to understand and remember detailed instructions; to carry out very short and simple instructions; to carry out detailed instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without duly distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to set realistic goals or make plans independently of others." (Tr. at 502-04.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ acted "as his own medical expert," that the ALJ failed to consider the combined effect of Claimant's impairments, and that the ALJ erred in assessing Claimant's credibility.  (Pl.'s Br. at 11-26.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Claimant could perform some light work during the relevant time period, that the ALJ properly considered the combined effect of Claimant's impairments and properly assessed Claimant's credibility.  (Def.'s Br. at 10-20.)

ALJ Assessment of Medical Evidence

Claimant first argues that the ALJ erred in assessing the medical evidence. Specifically, Claimant asserts:

> The ALJ found that Brown had "severe" physical and mental impairments based o [sic, on] the diagnoses and reports of a variety of medical providers and examiners.  Since Brown had no past relevant work, he couldn't return to an occupation that never existed.  Thus, after step four in the sequential evaluation, the burden shifted to the Commissioner to determine if there was any work in the regional or national economy that Brown could perform. Thus, the medical opinions were critical to the determination as to whether Brown was disabled or not.  However, the ALJ rejects every opinion evidence in the record.  He rejects the opinion of Dr. Lim who, on October 8, 2008, said that Brown's physical condition was not severe.  (Tr. 22).  He rejects the opinion of Ph.D. psychologist, Holly Cloonan, who on July 2, 2009, also said his mental condition was not severe.  He rejects the opinion of Dr. Gomez who, on July 2, 2009, said that again Brown had a non-severe physical impairment.  *Id.* He rejected the opinion of examining psychologist Sheila Kelly who, on December 28, 2009, rendered an opinion which, if accepted, would have resulted in a finding of total disability.  (Tr. 22-23).  Finally, he rejected the opinion of Dr. Warren who rendered several statements indicative of disability, including one on February 23, 2010.

> By rejecting every opinion in the record, the ALJ acted as his own medical expert.  There is considerable authority determining that the attempt of the ALJ to fashion an RFC without any medical support is reversible error.

(Pl.'s Br. at 12-14.)

The Commissioner argues that substantial evidence supports the ALJ's evaluation of the evidence.  (Def.'s Br. at 10-17.)   Specifically, the Commissioner asserts:

> The final responsibility for determining a claimant's RFC is reserved to the Commissioner.  20 C.F.R. § 416.927(e)(2).  For cases at the hearing level, that

responsibility rests with the ALJ.  20 C.F.R. § 416.946.  Moreover, contrary to Plaintiff's contention otherwise, (Pl.'s Br. at 13), the RFC finding is an administrative - not medical - determination.  20 C.F.R. § 416.927(a)(2).  Therefore, the ALJ has the duty and authority to make an independent assessment of a claimant's RFC based on the evidence of record.

In this case, the ALJ reviewed the record evidence and concluded that Plaintiff retained the residual functional capacity [RFC] to perform a range of light exertional work (Tr. 18, Finding No. 4).

The ALJ recognized that Plaintiff had severe impairments...but no legitimate record evidence demonstrates that Plaintiff's impairments created greater functional limitations than those provided by the ALJ in his comprehensive RFC.

Specifically, as the ALJ discussed (Tr. 14-23), the evidence of record shows...mild arthritis and unremarkable examination findings, unremarkable clinical findings, no demonstration of significant functional limitations, and relief of depression symptoms from medication, it was reasonable for the ALJ to conclude that Plaintiff could work within the generous parameters provided in his RFC finding.

There is no merit to Plaintiff's contention that the ALJ's RFC finding is unsupportable because he rejected the opinions of Drs. Kelly and Warren.  Pl.'s Br. at 13-14.  Contrary to Plaintiff's contention otherwise, the ALJ provided legitimate reasons why he could not credit the restrictive opinions of these doctors (Tr. 23).

(Def.'s Br. at 10-12.)

Claimant responds with a reiteration of his argument that the ALJ acted as his own

medical expert.  Specifically, Claimant asserts:

The Defendant either did not understand the issue raised by Brown or, realizing he didn't have a defense, intentionally skirts the issue and addresses a contention that Brown didn't even raise.  The question is not whether the ALJ "provided legitimate reasons why he could not credit the opinions" of Plaintiff's treating doctor and an examining psychologist (Comm'r Br., at 12).  The issue is whether there was sufficient medical evidence in the record to support the ALJ's RFC assessment. However, implicit in the Defendant's argument is that the ALJ was entitled to rely on the psychological assessment of Psychologist Larry J. Legg.  What the Defendant doesn't disclose is that the ALJ could not have relied on Legg's report.  He did not perform an RFC assessment.  Further, except for borderline intellectual functioning, he

determined that Brown did not have any mental impairment.  Thus, his assessment was contrary to the ALJ's own findings.

(Pl.'s Reply Br. at 2-3.)

In an extensive fourteen-page decision, the ALJ considered the entire record and

made these findings regarding the medical opinions:

On January 2, 2002, Michael Istfan, M.D., performed a rheumatologic evaluation of the claimant and suspected that he had the early stages of spondyloarthropathy that was undifferentiated at that time.  Dr. Istfan reported that the claimant may develop classic ankylosing spondylitis in the future (Exhibit 10F/56).  On November 16, 2007, the claimant was seen for a possible flare up as he had complaints of aching all over and feeling tired (Exhibit 10F/25).  On June 19, 2008, an x-ray of the claimant's lumbar spine revealed blunting of the lordotic curve and possible sacroiliitis suggestive of spondyloarthropathy.  An x-ray of the claimant's pelvis revealed possible sacroiliitis suggestive of spondyloarthropathy (Exhibit 10F/11).

On February 20, 2007, the claimant was seen for complaints of neck and back pain after being involved in a motor vehicle accident.  He reported having pain when turning his neck.  The diagnosis was neck sprain (Exhibit 2F).  On September 23, 2008, an x-ray of the claimant's lumbar spine revealed evidence of subtle lumbar dextroscoliosis (Exhibit 3F).

On September 23, 2008, Miraflor Khorshad, M.D., performed a physical examination of the claimant and diagnosed juvenile rheumatoid arthritis, possible lupus erythematosus, and lumbar dextroscoliosis.  Dr. Khorshad noted that the claimant was diagnosed with ankylosing spondylitis at the age of 12 (Exhibit 4F).

A progress note from Clay Primary Care dated March 4, 2009, revealed that the claimant was seen in follow-up of a motor vehicle accident.  Examination revealed that he had tenderness to the touch in the lumbosacral area, right hip area, and neck area.  The claimant had pain upon range of motion.  He was prescribed Lortab for pain (Exhibit 17F/12).

Based on the above evidence, the undersigned finds that the claimant has severe physical impairments of history of juvenile rheumatoid arthritis, back pain/possible ankylosing spondylosis, and pelvic pain.  Although there is little evidence supporting the claimant's allegations regarding back pain, giving weight to the testimony of the claimant and his mother and giving the claimant the maximum benefit of doubt the undersigned finds that the claimant's back pain is severe.

22

With regard to the claimant's alleged mental impairments, on December 1, 2008, Larry Legg, M.A., performed a consultative psychological evaluation of the claimant and diagnosed borderline intellectual functioning.  On the WAIS-III the claimant obtained a verbal IQ of 77, a performance IQ of 83, and a full scale IQ of 78.  The scores were considered externally valid (Exhibit 6F).

A progress note from Clay County Primary Care dated October 5, 2009, revealed that the claimant was seen for complaints of increased anxiety and nervousness.  The assessment was anxiety disorder.  The claimant was advised to seek treatment at the walk-in clinic at Process Strategies (Exhibit 17F/16).

On November 12, 2009, Randy Warren, M.D., performed an evaluation of the claimant and diagnosed panic disorder with agoraphobia, social phobia, obsessive compulsive disorder, mathematics disorder, and reading disorder. The claimant was prescribed Prozac for his condition (Exhibit 19F).

Based on the above evidence, the undersigned finds that the claimant has severe mental impairments of borderline intellectual functioning and anxiety. Although there is little medical evidence supporting the claimant's allegations regarding anxiety, giving weight to the testimony of the claimant and his mother regarding anxiety and giving the claimant the maximum benefit of doubt, the undersigned finds that the claimant's anxiety is severe.  Further, the undersigned rejects the diagnoses of obsessive compulsive disorder as it appears to be based on the claimant's subjective complaints.

As to non-severe impairments, the claimant's (*sic*, claimant) alleges problems with diarrhea.  At the hearing the claimant's mother testified that he has diarrhea at least every other day and has to go four times per day.  She stated that he goes to the bathroom three to four times per day to the bathroom for 10 to 15 minutes at least.  The undersigned notes that there is no evidence of any treatment for diarrhea and no evidence that is (*sic*, it) results in any functional limitations.  Accordingly, the undersigned finds that the claimant's alleged diarrhea is non-severe.

As to the claimant's alleged eye condition, at the hearing the claimant's mother stated that his eye condition is related to his arthritis.  She stated that during a severe flare up he has to go everyday for steroid drops.  A progress note from Ghassan Dagher, M.D., dated January 5, 2007, revealed that the claimant had no pain and no photosensitivity of the eyes (Exhibit 11F).  A note dated July 24, 2007, indicated that the claimant reported feeling better (Exhibit 16F).  The undersigned notes that there is no evidence that the claimant's eye condition has resulted in more than minimal limitation of function.  Further, the claimant's mother testified that the claimant's eye

condition flares upon (*sic*, up) only about once per year.  Accordingly, the undersigned finds that the claimant's eye condition is non-severe.

On May 9, 2007, John Eckerd, M.D., evaluated the claimant upon referral from Dr. Istfan for palpitations.  Dr. Eckerd reported that the claimant had palpitations but no chest pain or fainting.  Examination of the claimant's heart demonstrated a quiet precodium with no heaves, lifts, or dills.  A regular rate and rhythm was present with no murmurs or clicks.  Palpation of the carotid, brachial, femoral and pedal pulses were normal.   The claimant's electrocardiogram was within normal limits.  Dr. Eckerd found no evidence of a structural heart defect.  He reported that the claimant had no activity restriction from a cardiac standpoint (Exhibit 1F).  Based on this evidence the undersigned finds that the claimant has no medically determinable cardiac impairment....

As for the opinion evidence, on October 8, 2008, Rogelio Lim, M.D., a reviewing physician at the state agency, completed a Physical Residual Functional Capacity Assessment form and opined that the claimant had no severe physical impairment (Exhibit 5F).  The undersigned gives little weight [to] this opinion as it is inconsistent with the evidence now of record.  The claimant's allegations are also given some weight.

On December 16, 2008, Holly Cloonan, Ph.D., a reviewing psychologist at the state agency, completed a Psychiatric Review Technique form and opined that the claimant had no severe mental impairment (Exhibit 7F).  The undersigned gives little [weight to this] opinion as it is inconsistent with the evidence of record.  The claimant's allegations are also given some weight.

On July 2, 2009, A. Rafael Gomez, M.D., a reviewing physician at the state agency, completed a Physical Residual Functional Capacity Assessment form and opined that the claimant had no severe physical impairment (Exhibit 8F).  The undersigned gives little weight to this opinion as it is inconsistent with the evidence now of record.  The claimant's allegations are also given some weight.

On December 28, 2009, Sheila Emerson, M.A., performed a psychological evaluation of the claimant at the request of the claimant's attorney and diagnosed generalized anxiety disorder; social phobia; pain disorder; possible personality disorder, NOS with dependence, avoidant, schizoid, and obsessive characteristics; and borderline intellectual functioning. Ms. Kelly completed an assessment form and opined that the claimant was extremely limited in the ability to interact appropriately with the general public. Ms. Kelly further opined that the claimant was markedly limited in the ability to maintain regular attendance and be punctual within customary tolerances; work in coordination or proximity to others without being unduly distracted by them;

and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Exhibit 22F). Little weight is given to this opinion as it is inconsistent with evaluation of the claimant by Mr. Legg at the consultative evaluation, and it is inconsistent with the claimant's treatment history. Further, this evaluation was arranged in an attempt to bolster claimant's application for disability benefits, and the claimant may have presented himself as more limited than he really is.

On February 23, 2010, Dr. Warren who began treating the claimant in November 2009 completed an assessment form and opined that the claimant was extremely limited in the ability to maintain regular attendance and be punctual within customary tolerances; work in coordination or proximity to others without being unduly distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and travel in unfamiliar places or use public transportation. He further opined that the claimant was markedly limited in the ability to interact appropriately with the general public and to respond appropriately to changes in a routine work setting (Exhibit 23F). Little weight is given to these limitations as they are extreme and not supported by this physician's treatment records.

In summary, the claimant's subjective complaints and alleged limitations are not fully persuasive and the record as a whole establishes that he retains the capability to perform work activities with the limitations as set forth above.

(Tr. at 14-16, 23-24.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(d)(2).

Under § 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 416.927(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(d)(2) (2005). Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996).

Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Section 416.927(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the

more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Under § 416.927(d)(1), more weight generally is given to an examiner than to a non-examiner. Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §416.927(d)(2)(2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

With respect to Claimant's argument that the ALJ gave insufficient weight to Dr. Warren's and Ms. Kelly's opinions and substituted his own opinion, the undersigned finds that the ALJ had the duty and authority to make an independent assessment of the medical evidence of record and Claimant's residual functional capacity. The undersigned has

thoroughly reviewed the record and concludes that the ALJ did not err in his responsibility to review the case, make findings of fact, and resolve conflicts of evidence. The ALJ recognized that Claimant had severe impairments but the medical evidence of record does not show that Claimant's impairments created greater functional limitations than those provided by the ALJ in his comprehensive RFC. The evidence of record shows mild arthritis, unremarkable examination and clinical findings, no demonstration of significant functional limitations, and relief by medication of his psychological symptoms. Furthermore, the ALJ provided good reasons why he could not credit the restrictive opinions of Ms. Kelly and Dr. Warren per 20 C.F.R. § 416.927(d)(2) (2010). (Tr. 23-24.)

Combined Effect of Mental Impairments

Claimant next argues that the ALJ failed to properly consider the combined effect of Claimant's mental impairments. (Pl.'s Br. at 14-20.) Specifically, Claimant asserts:

The ALJ found only two mental impairments: borderline intellectual functioning and anxiety disorder. However, his anxiety disorder had multiple dimensions which remain unaccounted for in the ALJ's discussion of the evidence and in his RFC assessment...

Thus, the ALJ's general reference to an anxiety disorder did not take into account the separate and multiple variations, the type of anxiety disorder experienced by Brown, each one of which has a separate DSM-IV classification and each one of which has separate, as well as overlapping symptoms. In other words, his anxiety disorder would likely cause irritability, fatigue, muscle tension, and difficulty concentrating. His social phobia would make it difficult for him to interact with unfamiliar people or be scrutinized by others, or be placed in unfamiliar situations. His OCD symptoms would make it difficult for him to function in untidy or changing environments. They would seriously impact his concentration, persistence, and pace. His panic attacks would do the same. His agoraphobia, along with his social phobias, would keep him at home most of the time and usually upon leaving, he would need to be accompanied by a family member or another familiar companion.

The error was critical. Even eliminating symptoms associated with social

phobia and panic attacks with agoraphobia, the vocational expert testified that OCD symptoms as described by Brown and his mother would preclude substantial gainful employment.

Finally, with uncontested evidence of a Reading Disorder and Mathematics Disorder (See DSM-IV, at 48-50, 50-51), the ALJ simply ignores these impairments. While the ALJ limited Brown to only occasional writing and reading, such limitations don't doesn't [sic] take into account the level of his reading and writing.

(Pl.'s Br. at 14-15, 19-20.)

The Commissioner argues that the ALJ properly considered the combined effect of

Claimant's impairments. (Def.'s Br. at 17-19.) Specifically, the Commissioner asserts:

There is no merit to Plaintiff's claim that the ALJ did not consider his impairments in combination. Pl.'s B. At 19-20. At step two of his decision, the ALJ discussed Plaintiff's severe impairments...Next, at step three, the ALJ properly found that Plaintiff did not have an impairment or "combination of impairments" that met or medically equaled the requirements of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16, Finding No. 3). Courts have found such analyses sufficient to show that an ALj adequately considered the combination of a claimant's impairments. See Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1991)...

At step two, the ALJ extensively discussed the medical evidence concerning each of Plaintiff's allegedly disabling impairments and explained whether or not each was severe (Tr. 14-16). Plaintiff attempts to mislead this Court by arguing that the ALJ's step two finding was inadequate, but the ALJ's RFC finding accounts for all of Plaintiff's functional limitations that were reasonably established in the record. The ALJ's provision that Plaintiff is limited to no more than occasional reading and writing accounts for his learning disorder; the limitations to simple, routine, repetitive tasks and to only occasional work setting changes account for Plaintiff's anxiety symptoms that were relieved with medication and did not require treatment until the end of the relevant period; the limitation to only occasional interaction with the public and co-workers accounts for Plaintiff's complaints of social phobias; and the limitation to the modest demands of light work, as well as the postural limitations, accounts for the symptoms of Plaintiff's arthritis (Tr. 18). In light of this comprehensive RFC, as well as the ALJ's thorough analysis at steps two and three, Plaintiff's claim that the ALJ did not consider his impairments in combination fails.

Finally, the ALJ's finding that Plaintiff's impairments did not preclude his

performance of some light work is further bolstered by vocational expert testimony. At the administrative hearing, the ALJ asked the vocational expert to consider all of Plaintiff's limitations that were reasonably established by the record (Tr. 384-85). Specifically, the ALJ asked the vocational expert whether an individual with Plaintiff's vocational factors could perform work within the parameters prescribed in the above RFC finding (Tr. 59-61). In response, the VE testified that such an individual could perform the representative light occupations of cleaner, hand packer, and price marker (Tr. 60-61).

(Def.'s Br. at 17-19.)

Claimant responds as follows:

Citing a few cases out of this jurisdiction, the Defendant argues that at step three of the sequential evaluation, the ALJ's assertion that "Plaintiff did not have impairments or 'combination of impairments' that met [a listing]" was sufficient to establish that he "adequately considered the combination of...claimant's impairments." (Tr. 17-18). Of course, that's not the law in the Fourth Circuit and it shouldn't be as such an un[a]ddressed assertion is unsupported by an explanation, and as a result, "is beyond meaningful appellate review." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)...

The Defendant's argument suffers from other defects as well. Even if the ALJ's conclusory assertion could constitute substantial evidence, he applies it only to the listings. Combination must be considered not only with respect to the listing but in connection with step five of the sequential evaluation as well. At step five, the ALJ's decision is devoid of even a naked reference to combination.

The Defendant argues that the ALJ accounted for Brown's social phobia by limiting him to "only occasional interaction with the public and co-workers." The fact that Defendant did not address how the ALJ's RFC took into account Brown's OCD, panic attacks, and agoraphobia is conclusive proof that he couldn't and that the ALJ didn't.

(Pl.'s Reply Br. at 1-2.)

At step two of his decision, the ALJ discussed Plaintiff's severe impairments. (Tr. at 15-17.) Then, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the requirements of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 17-18.) Specifically,

regarding the mental impairments, the ALJ found:

> The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.05, and 12.06...
>
> In activities of daily living, the claimant has mild restriction. The claimant reported doing light housework and running errands (Exhibit 6F). The claimant reported being able to take care of his own personal needs (Exhibit 4E).
>
> In social functioning, the claimant has moderate difficulties. The claimant reported having several friends including a girlfriend. He reported interacting with several of his family members on a regular basis. He reported leaving his home three to four times per week to run errands with his mother or attend church (Exhibit 6F). At the hearing the claimant testified that he does not go anywhere unless with his parents other than maybe the gas station.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant reported reading his Bible and watching television (Exhibit 6F). The claimant reported being unable to pay bills, count change, handle a savings account, or use a checkbook/money order (Exhibit 8E).
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria of 12.02 and 12.06 are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.
>
> The limitations identified in the "paragraph B"...criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listings of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has

found in the "paragraph B" mental function analysis.

Turning back to listing 12.05, the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs...and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded.   In this case, these requirements are not met because the record indicates that the claimant can manage his own daily activities (Exhibit 6F).

As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less.

Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional significant work-related limitation of function.

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he could never climb ladders, ropes, or scaffolds and should avoid all exposures to hazardous machinery and unprotected heights.  He would be limited to no more than occasional reading and writing.  He would be limited to simple, routine, and repetitive tasks.  He could have only occasional changes in the work setting.  He would be limited to no more than occasional interaction with the public and co-workers.

(Tr. at 17-18.)

The social security regulations provide,

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 416.923 (2010).  Where there is a combination of impairments, the issue "is not

only the existence of the problems, but also the degree of their severity, and whether,

together, they impaired the claimant's ability to engage in substantial gainful activity."

Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be

fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  Id.  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

The undersigned finds that the ALJ's findings at steps two and three are adequate, that the ALJ's RFC finding accounts for all of Claimant's functional limitations that were established in the record, and that at step five, the ALJ properly acknowledged that Claimant had no past relevant work experience.  (Tr. at 15-24.)  In the ALJ's RFC finding at step four, he limited Claimant to no more than "occasional reading and writing", which accounts for his learning disorder.  (Tr. at 19.)  The undersigned notes that Claimant reads the Bible every day.  (Tr. at 259.)  The ALJ also limits Claimant to "simple, routine, repetitive tasks" and to "only occasional changes in the work setting", which account for Claimant's anxiety-related symptoms, including complaints of OCD, panic attacks, and agoraphobia, that were relieved with medication prescribed by Dr. Warren and did not require treatment until the end of the relevant period.  (Tr. at 19, 463.) Further, the ALJ's limitation to "no more than occasional interaction with the public and co-workers" takes in to account Claimant's social phobia complaints.  (Tr. at 19.)  Also, the ALJ's limiting Claimant to light work, with postural limitations, shows that he considered Claimant's arthritis symptoms.  Id.  At the administrative hearing the ALJ asked the vocational expert to consider all of Claimant's limitations that were established by the record and the VE testified that an individual with such limitations could perform the representative light occupations of cleaner, hand packer, and price marker (Tr. 59-61).

33

<u>Credibility</u>

Claimant next argues that the ALJ erred in not finding Claimant to be fully credible.

(Pl.'s Br. at 20-26.)  Specifically, Claimant asserts:

Critical in this case is the fact that the ALJ found that Brown's physical and mental impairments could reasonably be expected to produce his alleged symptoms.  Thus, Brown could establish his credibility pursuant to the second prong of the credibility determination by purely subjective evidence. See *Hines v. Barnhart*, 453 F3d 559 (4th Cir. 2006).

Starting with Brown's physical impairments, the ALJ examines the admittedly weak objective evidence and asserts that the evidence is "inconsistent with the claimant's allegations and support (sic) finding that he is not fully credible."  (Tr. 20).  However, the ALJ fails to consider the psychological component to Brown's pain condition.  Objective testing by Psychologist Kelly revealed a valid profile with "elevated anxiety and somatic signs."  Indeed, Brown was shown to be "very focused" on his pain and somatic concerns.  While Brown did not have a full blown Somatoform Disorder, the testing results revealed a strong somatic component to his pain condition. The ALJ also ignored evidence that Brown's perception of his pain condition was enhanced by the fact it provided him with a rationale to avoid stressful social interactions.

The ALJ then compounds his error by using Brown's alleged "lack of credibility with regard to his physical complaints raises question (sic) as to his credibility with regard to his alleged psychological impairments."  (Tr. 20).

While the ALJ references some plausible reasons for finding Brown not credible, he distorts or mischaracterizes the evidence with respect to the important considerations...

There is, in fact, little inconsistency in Brown's statements or his mother's, for that matter, about his social activities. The evidence of the impact on Brown's ability to function is consistently displayed throughout the record.  Despite the ALJ's determination that Brown only had moderate limitations in social activities, the uncontested and consistent record evidence demonstrates severe social functioning...

Similarly, his daily activities were almost exclusively limited to activities within his home and even then they were quite limited.  Again, his statements about his daily activities were generally consistent throughout the record. (Tr. 259, 486-487)...Like the ALJ did in *Hines v. Barnhart*, 453 F.3d 559 (4th

34

Cir. 2006), here the ALJ selectively cites evidence concerning tasks which Brown was "capable of performing," in effect, ignoring, or downplaying, the qualifications he recited about such activities.

Also, the ALJ relies, in part, on Brown's resistance to psychotherapy treatment. But if psychotherapy is group therapy, which it usually is, then Brown's reluctance is perfectly understandable. The ALJ also points to this conservative treatment. But, his lack of treatment is explained by his reluctance to leave his home.

(Pl.'s Br. at 21-25.)

The Commissioner contends that the ALJ did not err in his analysis of Claimant's

credibility. Specifically, the Commissioner argues:

In light of the above record showing that Plaintiff's physical impairment's caused no more than mild arthritis and some swelling; his physical examinations were unremarkable; his clinical studies yielded negative or only mild findings; and medication relieved the symptoms of Plaintiff's anxiety and OCD; the ALJ could not credit Plaintiff's claims of totally disabling symptoms. The Commissioner evaluates symptoms on the basis of medical signs and laboratory findings that reasonably could be expected to produce the symptoms alleged. 20 C.F.R. §416.929. Agency regulations specifically provide that allegations of subjective symptoms alone cannot support a finding of disability and an ALJ is not required to accept a claimant's testimony uncritically. Id. ...

In this case, the ALJ explained the controlling regulations and rulings permitted him to consider the record evidence discussed in the preceding section to assess the veracity of Plaintiff's hearing testimony and record statements. (Tr. 18-22)....

The ALJ properly determined that Plaintiff's claims of totally debilitating symptoms were not fully credible. The ALJ based his decision on the noted normal or only mild examination findings from Plaintiff's treating and examining physicians; the essentially normal mental status exams of record; the lack of mental health treatment; the relief of symptoms provided by psychotropic medications; Plaintiff's refusal to follow recommended treatment without good reason; and Plaintiff's failure to seek mental health treatment until the end of the relevant period. (Tr. 19-22). The ALJ also cited Plaintiff's documented ability to attend school and graduate high school despite his claim of agoraphobia (Tr. 38, 133-57), his inconsistent statements concerning his social life...and the lack of medical evidence to corroborate Plaintiff's reported need to minimize his daily activities (Tr. 19-22).

(Def.'s Br. at 14-16.)

Claimant responds that the Commissioner "did not even address Plaintiff's argument. His failure to do so is unimpeachable proof of the validity of Brown's argument." (Pl.'s Reply Br. at 3.)

Regarding Claimant's credibility, the ALJ made these extensive findings:

At the hearing the claimant testified that he cannot work due to experiencing pain every minute of every day in his hand, back, and hips. He is unable to walk or sit very long. He freaks out if around people. He graduated from high school in 2008. He mostly drove to school. He usually sits in the back of the classroom. He was in special education classes and there were not very many kids in the class. He missed school due to doctors' appointments. He takes Idomethacin and Sulfasalazine four times per day for pain. He is being treated by Dr. Istfan for his pain. He sees him once every three months. He has been on pain medication from Dr. Istfan for eight years. He stated that his onset date is June 1, 2002, due to him experiencing a lot of pain and he began seeing Dr. Istfan. He has recently started seeing Dr. Warren for panic, anxiety, and obsessive compulsive disorder. He did not have insurance for a while. He thinks his dad had insurance on him while he was in school which is how he went to Dr. Istfan. He stated that he has no friends. He used to have a My Space account. He drives his mom to the store but he usually does not go in. He stated that his physical problems are unpredictable. He started on Prozac that has helped a little bit but not much at all that he can tell. He has done yard work with a riding lawn mower. He does not go anywhere unless with his parents other than maybe to the gas station.

At the hearing the claimant's mother testified that the claimant cannot work because he cannot sit very long. He is constantly trying to get comfortable. He sometimes lies flat on the floor. He stays tired all the time. He lies down for about a one hour nap around 1:00 pm during the day and is always in bed at night by about 9:00 pm. He goes to a very small church that is basically just their family. He does not socialize on the internet or go anywhere. He visits his sister who lives behind them, and he visits for about 10 to 15 minutes at a time. He takes her to K-Mart or Wal-Mart and basically just sits in the car. He does not feel comfortable in public. He gets nervous just thinking about going somewhere. During a panic attack his face turns red, he gets sweaty, and he can hardly breathe. He is obsessive compulsive and cannot stand anything out of place. He cannot stand the mess. She stated that side effects of his medications may be causing his fatigue. She stated that his panic attacks and anxiety started when he was about age 12. During the sixth grade year of school he would call for his mom to get him out of

36

class.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant and his mother's testimony are not supported by the medical evidence of record. Accordingly, the undersigned find that the claimant and his mother are not fully credible.

In fact, treatment records from Dr. Istfan, the claimant's primary care physician, frequently indicate that the claimant was doing well or very well. During examination by Dr. Istfan on January 2, 2002, the claimant had minimal swelling of the left wrist and the MCP joints on the right with associated tenderness. There was "sausage" like swelling involving the right fifth toe with mild erythema and tenderness. However, there was no synovitis elsewhere and the claimant's range of motion was well preserved. There were no nodules or mucocutaneous lesions. Laboratory studies were essentially normal. The claimant's rheumatoid factor was negative. Radiographs of the claimant's hands and feet were unremarkable except for some soft tissue swelling of the right fifth MTP (Exhibit 10F/1). A progress note from Dr. Istfan dated October 24, 2002, indicated that the claimant was doing well overall (Exhibit 10F/42). On February 20, 2003, the claimant was reported as doing well overall. He had no recent flare-ups and no new problems (Exhibit 10F/40). On June 18, 2003, the claimant was doing well and had no pain to speak of. There was no visible swelling. He had been very active and had not needed his NSAIDs. The assessment was juvenile spondylosis, doing well (Exhibit 10F/39). On February 13, 2004, an x-ray of the claimant's pelvis was negative. Additionally, x-rays of the claimant's hands and wrists were negative (Exhibit 12F/5). On October 4, 2004, the claimant had no peripheral joint pain or swelling (Exhibit 10F/35). On December 12, 2005, an x-ray of the claimant's hands was essentially normal; however, he did have possible mild inflammatory arthritis at the proximal interphalangeal joints (Exhibit 10F/31). On June 8, 2006, the claimant reported staying busy and doing lots of yard work (Exhibit 10F/30). On December 8, 2006, the claimant had no joint pain, swelling, or stiffness. He was staying active with no limitations and did not need any medication (Exhibit 10F/29). On February 21, 2008, Dr. Istfan reported that the claimant's juvenile arthritis was doing fair (Exhibit 10F/18). On April 15, 2009, the claimant complained of persistent hip pain. However, an x-ray of the claimant's right hip was normal (Exhibit 10F/5). On November 3, 2009, the claimant reported feeling better overall. The assessment was spondylosis

with improvement (Exhibit 20F). These normal findings are inconsistent with the claimant's allegations and support finding that he is not fully credible.

During examination by Dr. Khorshad on September 23, 2008, the claimant complained that his back hurt constantly, he had pain of the hips and knees, and he was unable to sit for a prolonged time. However, on examination the claimant had a normal gait. He did not require the use of any assistive device. He was able to sit and squat. Musculoskeletal examination revealed normal range of motion (Exhibit 4F). Further, a progress notes from Clay Primary Care dated October 31, 2008, revealed no unexplained myalgia, arthralgias, or edema (Exhibit 17F/8). Again the claimant had essentially benign objective findings on examination, which is inconsistent with the limitations he alleges.

During psychological evaluation by Mr. Legg on December 1, 2008, the claimant reported that his grades were okay when he graduated...On mental status examination the claimant's mood was euthymic, and his affect was broad. His stream of thought was within normal limits. His thought content was normal. He had no evidence of hallucinations or illusions. The claimant's judgment was within normal limits. His immediate memory, recent memory, and remote memory were judged to be within normal limits. The claimant's concentration was only mildly deficient, and his persistence and pace were within normal limits. The claimant's social functioning was within normal limits based on clinical observations of his social interaction with the evaluator and others during the evaluation. Mr. Legg opined that the claimant's prognosis was good (Exhibit 6F). These normal findings on mental status examination are inconsistent with the severity of the claimant's complaints. Furthermore, the claimant reported that he had never received any outpatient community mental health services, never been hospitalized for any psychiatric or psychological reasons, and never taken any psychotropic medications which indicates that his condition is not as severe as alleged.

During mental status examination by Dr. Warren on November 12, 2009, the claimant was friendly, attentive, and fully communicative but did appear anxious. He exhibited normal speech and his language skills were intact. The claimant's affect was appropriate, full range, and congruent to his mood. There were no signs of hallucinations, delusions, bizarre behaviors, or other indications of psychotic process. The claimant's associations were intact, and his thinking was logical. He denied suicidal ideations or intentions. Cognitive functioning and fund of knowledge was intact and age appropriate. The claimant's short and long term memory were intact. His ability to abstract and do arithmetic calculations was intact. The claimant's social judgment was intact. There were no signs of hyperactive or attention difficulties. Psychotherapy was recommended but the claimant was resistant

and declined at that time (Exhibit 19F).  The claimant's normal mental status examination and resistance to recommended treatment suggest that the claimant's symptoms may not be as serious as alleged in connection with this claim.

The claimant's limited mental health records show improvement in his condition after being on Prozac for a month and an improved global assessment of functioning level to 55 (moderate symptoms) after his dosage of Prozac was increased...The undersigned notes that this improvement with medication indicates that the claimant's mental condition is not disabling.

The undersigned notes that on the claimant's Disability Report he only alleged problems with back pain and learning disability.  Further, during consultative evaluation by Mr. Legg in Exhibit 6F the claimant only alleged problems with ankylosing spondylitis and learning disability.  The claimant did not complain of anxiety, pain, or obsessive compulsive problems either of these times.  Additionally, the claimant had no treatment for a mental health problem until when he very recently starting (sic, started) seeing Dr. Warren.  The claimant's failure to mention these problems and lack of mental treatment suggest that the claimant's conditions are not as severe as alleged.

The claimant testified that he did not seek mental health treatment due to no health insurance.  Yet, he testified that his problems started at age 12 and that his parents had insurance while he was a minor which is how he was able to see Dr. Istfan.  Additionally, when seen by Mr. Legg the claimant reported having health insurance through his father's employer (Exhibit 6F/2).

At the hearing the claimant testified to essentially no social activities and the undersigned notes that this is substantially different than his reported activities to Mr. Legg in Exhibit 6F.  As discussed earlier in this decision, the claimant reported having several friends including a girlfriend; interacting with friends by telephone, E-mail, and My Space posting; interacting with several family members on a regular basis; attending church; and running errands with his mother.  This inconsistency reflects poorly on the claimant's credibility.

The undersigned notes that the claimant's allegations that he cannot leave the house or tolerate being around essentially anybody is inconsistent with the claimant being able to attend school and graduate.

Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless, the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

As to side effects of medication, there are none established which would interfere with the jobs identified below by the vocational expert.

As to the effectiveness of treatment, the record indicates the claimant's treatment has been rather conservative while the claimant alleges such significant problems that it would be expected that there would be intensification of treatment, which has not occurred.

The undersigned notes that the claimant minimizes his activities of daily living but there is no evidence to support such restrictions...

In summary, the claimant's subjective complaints and alleged limitations are not fully persuasive and the record as a whole establishes that he retains the capacity to perform work activities with the limitations set fourth above.

(Tr. at 20-24.)

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's credibility and failed to consider Claimant's "perception of his pain condition", the undersigned finds that the ALJ properly weighed Claimant's subjective complaints of pain and mental health concerns in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause his alleged symptoms. (Tr. at 20.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 20-23.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment,

the lack of evidence of side effects which would impact Claimant's ability to perform work, and his self-reported daily activities. Id.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: January 18, 2012

Mary E. Stanley
United States Magistrate Judge